IWTMM, INC., D/B/A MAST LONG TERM CARE, PLAINTIFF V. FOREST HILLS REST HOME, JUDY B. TEW, MAGNOLIA LANE HEALTHCARE, INC., AND MAGNOLIA LANE, LLC, DEFENDANTS

No. COA02-731

(Filed 18 March 2003)

**1. Contracts— requirements—description of purchasing terms—consideration**

   Both the consideration and the description of purchasing terms were sufficient in a requirements contract to supply pharmaceuticals to a rest home.

**2. Contracts— breach—interpretation of related agreements—12(b)(6) motion**

Whether to treat related agreements as one contract should not have been considered under a motion to dismiss for failure to state a claim.

Appeal by plaintiff from order filed 7 February 2002 by Judge Evelyn W. Hill in Vance County Superior Court. Heard in the Court of Appeals 18 February 2003.

*Warren, Perry & Anthony, P.L.L.C., by Sue E. Anthony, for plaintiff appellant.*

*The Law Firm of Hutchens & Senter, by Rudolph G. Singleton, Jr., for defendant-appellees Forest Hills Rest Home and Magnolia Lane Healthcare, Inc.*

BRYANT, Judge.

IWTMM, Inc. (plaintiff), doing business as Mast Long Term Care, appeals an order entered 7 February 2002 dismissing its complaint under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

On 17 September 2001, plaintiff filed a complaint against Forest Hills Rest Home (Forest Hills), Judy B. Tew, Magnolia Lane Healthcare, Inc., and Magnolia Lane, LLC (collectively defendants)[1] alleging breach of contract. The complaint stated in pertinent part:

7. The [p]laintiff entered into a contract with Forest Hills on or about March 1, 1999. . . .

8. The duration of the parties' contract is for three (3) years from April 1, 1999.

9. By letter dated April 27, 2001, and written by Judy B. Tew, the [d]efendants, Magnolia Lane Healthcare, Inc. and Forest Hills, indicated that they would "no longer need" [plaintiff's] services . . . .

10. . . . Forest Hills . . . has, in fact, failed and refused to do business with . . . [p]laintiff since May 1, 2001.

---

1. Plaintiff subsequently filed a voluntary dismissal without prejudice as to Judy B. Tew and Magnolia Lane, LLC.

11. The cancellation and termination of the contract by . . . [d]efendants is a breach of the parties' contract.

12. . . . Defendants have also breached the parties' contract as follows:

    a. . . . Defendants have failed and refused to continue to do business with . . . [p]laintiff, as provided in the contract and, specifically, to obtain their pharmaceuticals, drugs, supplies and equipment from . . . [p]laintiff.

    b. . . . Defendants have failed and refused to reimburse . . . [p]laintiff for the value of certain equipment (a drug cart and a fax machine) provided to them by . . . [p]laintiff.

Attached to the complaint were a copy of the parties' contract and the 27 April 2001 letter from Judy B. Tew, president of Magnolia Lane Healthcare, Inc., addressed to plaintiff. The contract consists of two separate agreements: a vendor-pharmacist agreement and a consultant-pharmacist agreement. Plaintiff's allegations pertain solely to the vendor-pharmacist agreement, which reads in pertinent part:

I. The pharmacy [(plaintiff)] . . . agrees to provide, furnish and supply pharmaceuticals, drugs, supplies and equipment to the home [(Forest Hills)] or to the patients therein upon the following terms and conditions.

. . . .

IV. The facility [(defendants)] hereby agrees to order all those pharmaceuticals[,] including prescriptions and supplies, for individual patients not commonly stocked in the facility from the pharmacy. In the event that any patient exercises his or her rights under the law to request purchase of such items from alternate supplier, the facility and pharmacy hereby agree to honor such requests only if such items are supplied in accordance with the drug distribution system currently provided by the pharmacy and currently utilized by the facility, and only if the alternate supplier can guarantee maintenance of the same quality and continuity of supplies and service as that provided by the pharmacy under this agreement.

. . . .

VI. The pharmacy agrees to bill each patient in conformity with the usual and proper method of billing required or accepted under the respective reimbursement or payment plans. . . .

. . . .

X. The parties agree that this contract will extend for three (3) years from . . . April 1, 1999. . . . [T]his agreement shall remain in effect for its full term.

XI. Pharmacy and [f]acility agree that in the event the [f]acility cancels for any reason this agreement[,] the [f]acility hereby agrees to reimburse the [p]harmacy for the drug dispensing equipment and any other equipment or supplies furnished by the [p]harmacy at their depreciated value at the time of cancellation. . . .

XII. The facility and the pharmacy agree that this contract automatically renews every three (3) years upon its expiration date unless notification is furnished in writing by either party ninety (90) days prior to expiration. In the event this contract terminates by its own terms, or another pharmaceutical supply company presents a competing offer to the facility during the existence of this contract, the pharmacy hereby reserves the right and the facility correspondingly agrees to allow the pharmacy the right to match any and all competing offers to provide pharmaceutical supplies. If the pharmacy presents a comparable situation to other offers, the facility hereby agrees to extend or preserve the term of this contract with the pharmacy at the amount and terms bid by the pharmacy.

Under the terms of the second agreement, the consultant-pharmacist agreement, plaintiff was also responsible for the general supervision of the facility's pharmaceutical services. With respect to termination, this agreement stated it could be "terminated by either party provided that ninety (90) days written notice prior to expiration [was] given to the other party."

The letter attached to the complaint stated:

This letter is to give you notice that I will no longer need your services effective 90 days from today. I will be glad to purchase the Med Cart and Fax Machine at a depreciated rate as we discussed this morning. I will continue to order my stock items from you until my 90[-]day notice expires.

On 16 November 2001, defendants moved to dismiss the complaint pursuant to Rule 12(b)(6). Following a hearing on the motion during which defendants argued there was no contract because the agreement lacked consideration and was too vague as to the purchasing terms and, in the event a contract had been formed, defendants had complied with the ninety-day notice provision required for termination, the trial court dismissed plaintiff's breach of contract claim.

---

The issues are whether: (I) the vendor-pharmacist agreement is insufficient to form a contract because it lacks consideration and specificity and (II), if it does constitute a contract, plaintiff stated a sufficient claim for breach thereof.

I

In ruling on a motion to dismiss pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure, the trial court determines "whether, as a matter of law, the allegations of the complaint, treated as true, are sufficient to state a claim upon which relief may be granted under some legal theory." *Harris v. NCNB*, 85 N.C. App. 669, 670, 355 S.E.2d 838, 840 (1987). "The complaint must be liberally construed, and the court should not dismiss the complaint unless it appears beyond a doubt that the plaintiff could not prove any set of facts to support his claim which would entitle him to relief." *Block v. County of Person*, 141 N.C. App. 273, 277-78, 540 S.E.2d 415, 419 (2000). The elements of a breach of contract claim are: "(1) existence of a valid contract and (2) breach of that contract." *Poor v. Hill*, 138 N.C. App. 19, 29, 530 S.E.2d 838, 845 (2000).

*Specificity of Contract Terms*

**[1]** At the 12(b)(6) hearing, defendants argued the vendor-pharmacist agreement did not form a valid contract because it contained only vague purchasing terms. The provision that lies at the heart of defendants' argument is the sentence obligating defendants to order from plaintiff those pharmaceuticals for defendants' patients "not commonly stocked in the facility." In its brief to this Court, defendants claim it is "the silence as to the identity and amount of pharmaceuticals to be ordered" that leaves the contract invalid. In support of their position, defendants rely on the general principle that "[t]o be enforceable, the terms of a contract must be sufficiently definite and certain, and a contract that ' "leav[es] material portions open for future agreement is nugatory and void for indefiniteness," ' " *Miller v.*

*Rose*, 138 N.C. App. 582, 587-88, 532 S.E.2d 228, 232 (2000) (citations omitted). Defendants, however, have overlooked two crucial factors. First of all, our law permits the use of requirements contracts, which are agreements to supply the other party to the contract with as much of the ordered good as needed by the purchaser. *Roanoke Properties v. Spruill Oil Co.*, 110 N.C. App. 443, 448, 429 S.E.2d 752, 755 (1993) ("valid requirements contracts . . . are recognized by our Courts and our Legislature"); *Carolina Builders Corp. v. Howard-Veasey Homes, Inc.*, 72 N.C. App. 224, 228, 324 S.E.2d 626, 629 (1985) ("[defendant's] testimony that he would buy everything plaintiff supplied so long as plaintiff would sell to him and his company is evidence of an output and requirements contract"); *see also Coal Co. v. Ice Co.*, 134 N.C. 574, 47 S.E. 116 (1904) (enforcing contract pursuant to which the plaintiff agreed to sell the defendant all the coal that may be required by the defendant during a specified time period). In this case, that means defendants obligated themselves to buy and plaintiff to sell as much of the pharmaceuticals as necessary to fill the requests of defendants' patients for pharmaceuticals not commonly stocked in the pharmacy.

The second and more important factor is that the parties' agreement for the sale of drugs in this case is governed by the North Carolina Uniform Commercial Code (N.C. UCC). *See* N.C.G.S. § 25-2-102 (2001) ("applies to transactions in goods"); N.C.G.S. § 25-2-105(1) (2001) (" '[g]oods' means all things . . . which are movable at the time of identification to the contract for sale"); *see also Parks v. Alteon, Inc.*, 161 F. Supp. 2d 645, 648-49 (M.D.N.C. 2001) (distinguishing *Batiste v. Home Prods. Corp.*, 32 N.C. App. 1, 231 S.E.2d 269 (1977), in which this Court held a physician's prescription for medicine did not constitute a sale of goods, and holding that a drug manufacturer's sale of drugs to a plaintiff would fall within the purview of the N.C. UCC); *Foyle by McMillan v. Lederle Labs.*, 674 F. Supp. 530 (E.D.N.C. 1987) (standing for the proposition that the sale of drugs is governed by the N.C. UCC where the court determined that a claim for breach of implied warranty of merchantability would lie against a pharmaceutical drug manufacturer whose product was used by a plaintiff-purchaser). Under the N.C. UCC, the failure to omit certain material terms will not invalidate the contract as courts are permitted to read into the contract good faith requirements. *See* N.C.G.S. § 25-2-204(3) (2001) ("[e]ven though one or more terms are left open[,] a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy"); *Varnell v. Henry M.*

*Milgrom, Inc.*, 78 N.C. App. 451, 453, 337 S.E.2d 616, 618 (1985) (applying "the 'good faith' obligation for output contracts in G.S. 25-2-306(1)" of the N.C. UCC). With respect to requirements contracts, the N.C. UCC states: "A term which measures the quantity by . . . the requirements of the buyer means such actual . . . requirements as may occur in good faith . . . ." N.C.G.S. § 25-2-306(1) (2001). As such, no definite amount needed to be stated in the vendor-pharmacist agreement.

Finally, although the pharmaceuticals to be supplied are only identified as those "not commonly stocked" by defendants, this description makes them capable of being identified by an offer of proof at trial. *See Koltis v. N.C. Dep't of Human Resources*, 125 N.C. App. 268, 271, 480 S.E.2d 702, 704 (1997) (to be binding it is sufficient that the terms are capable of being made definite and certain by proof); N.C.G.S. § 25-1-103 (2001) ("[u]nless displaced by [the N.C. UCC], the principles of law and equity . . . shall supplement its provisions"). We further note that the parties operated under the agreement for approximately two years without experiencing any difficulty in identifying the goods to be sold. Consequently, we deem the description of the pharmaceuticals to be supplied by plaintiff sufficient.

### Consideration

At the hearing, defendants also argued the vendor-pharmacist agreement between the parties lacked consideration. The agreement did not state any price terms with respect to the pharmaceuticals to be supplied; however, consideration need not consist of a promise to pay money for goods or services. Instead, it can take the shape of mutual promises to perform some act or to forbear from taking some action. John N. Hutson, Jr. & Scott A. Miskimson, *North Carolina Contract Law* § 3-6, at 170 (2001). In this case, the consideration for the parties' agreement consisted of plaintiff's promise to supply defendants with certain pharmaceuticals and defendants' counter-promise to stock plaintiff's products at its pharmacy and to sell them to its patients. Accordingly, the agreement does not fail for either lack of consideration or specificity.

II

[2] Defendants next contend that, in the event the contract is deemed to be valid, they did not breach the vendor-pharmacist agreement

because the letter attached to plaintiff's complaint indicates compliance with the ninety-day notice provision required for termination of the agreement. The terms of the vendor-pharmacist agreement, however, do not provide for termination at any time so long as a ninety-day notice is given. Instead, the agreement states the contract will automatically renew "every three (3) years upon its expiration date unless notification is furnished in writing by either party ninety (90) days prior to expiration." The only provision that is compatible with defendants' interpretation of the contract is found in the consultant-pharmacist agreement, which, in the last paragraph,[2] allows for termination of the contract "by either party provided that ninety (90) days written notice prior to expiration is given to the other party." The question thus remains whether to treat the two agreements as one contract with the provisions of each to be read in conjunction with one another or as two separate and independent contracts. The first interpretation, which, from a review of the transcript, appears to be the one adopted by the trial court, would allow for a reading into the vendor-pharmacist agreement the right granted at the end of the consultant-pharmacist agreement to terminate the contract at any time with a ninety-day notice. On the other hand, the second interpretation is consistent with plaintiff's reading of the two agreements and, if accepted, would lead to a finding that defendants did in fact breach the contract. How to properly interpret the contract, however, is a factual issue not appropriate for consideration under a 12(b)(6) challenge. As the complaint and its attachments do not allow for a conclusion "beyond a doubt" that plaintiff failed to state a claim upon which relief could be granted, this matter must be remanded for further proceedings. *Block*, 141 N.C. App. at 277-78, 540 S.E.2d at 419.

Reversed and remanded.

Judges HUNTER and ELMORE concur.

---

2. This paragraph stands out because it does not follow the format of the previous paragraphs and unlike the other paragraphs is not numbered.